## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

```
UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )      CRIMINAL ACTION
                                 )
v.                               )      No.  08-10027-MLB
                                 )
ISREAL TAPIA,                    )
                                 )
                Defendant.       )
_____    )
```

## MEMORANDUM AND ORDER

This case comes before the court on defendant's motions to suppress. (Docs. 19, 20). The motions are fully briefed and the court conducted an evidentiary hearing on July 28, 2008. (Docs. 21, 23, 24). The motions to suppress are denied for the reasons herein.

## I. FACTS[1]

On January 8, 2008, Trooper Lee Rose was at his office in Pratt County, Kansas, when he received a call from dispatch alerting him that an individual reported seeing a vehicle traveling at high speeds on Highway 54.  The vehicle was described as a silver car with Arizona license tag 820 ZEF.  Rose left his office and traveled west in his patrol car on Highway 54.  Rose observed a vehicle matching the description traveling east on Highway 54.  Rose made a u-turn and followed the vehicle into a gas station.  The vehicle, a Dodge Charger, parked and Rose parked his patrol car two spaces down, leaving one space between the vehicles.  Rose did not block the Charger's exit and did not activate his emergency lights.  Rose did,

---

[1] The facts consist of testimony heard at the hearing and the video of the encounter.  (Exh. 1).

however, activate the recording device in his patrol car.

Rose exited his patrol car and approached the driver's side window.  The Charger contained defendant, a female passenger and two small children.  The driver's side window was down about halfway and Rose asked if he could "talk with [defendant] for a minute."  Rose heard defendant respond, "I gotta go."[2]  Rose observed that defendant was on his cell phone.[3]  Defendant stepped out of the Charger.[4]  Rose asked defendant if he would "step over here."  Defendant replied "Sir."  Rose explained that he wanted to talk with him because of the speeding complaint.  Defendant made some sort of response about passing big trucks.  Rose asked defendant if he had his driver's license.  Defendant said that he did not have it with him.  Rose then

---

[2] In the video, defendant states, "No, I gotta go."

[3] Both defendant and Tiffany Kastner, the female passenger, testified that defendant was not on the phone but that Kastner was on the phone prior to the encounter with Rose.  Kastner and defendant have been living together since defendant's release, yet Kastner testified that during the past seven months, she and defendant have never discussed what transpired.  The court does not find Kastner's statement credible and, because Kastner would tell such an obvious lie, the court largely discounts her credibility regarding other events which occurred on January 8.

[4] Again, there was some dispute as to whether defendant or Trooper Rose opened the door.  Rose testified that defendant opened the door.  Defendant and Kastner testified that Rose opened the door but the court does not find the testimony of defendant or Kastner to be credible.  Defendant testified during direct examination that Rose had his hand on his gun and opened the driver's side door.  To illustrate, defendant placed his left hand on his side when describing Rose's conduct in putting his hand on his gun.  During cross examination, defendant then testified that Rose placed his left hand on the door and his right hand on the gun.  Defendant's explanation for the switch - that it had something to do with the way he was seated in the witness box, was not convincing.  Rose stated that he could not recall whether he put his hand on his gun but he did not remove the gun from its holster.  If Rose was inclined not to tell the truth, he would simply have testified that he did not touch his gun.  The court believes Rose and finds that defendant opened the door.

asked defendant if he had a license.  Defendant responded that he did have a license.  Rose asked defendant if he had any sort of identification at all.  Defendant responded that he did not.  Rose asked defendant his name and defendant responded "Phil Tapia."

Rose then asked if defendant would step over to the patrol car. At the patrol car, Rose asked defendant about the Charger.  Defendant said that it was a rental.  Rose asked defendant if he was the person who rented the Charger.  Defendant replied that his mother rented the Charger and that she was not traveling with him.  Rose asked defendant to write down his name and address and defendant wrote "Phil Tapia Jr."  Rose then asked defendant if he would sit in the front seat of the patrol car and if he, Rose, could retrieve the rental agreement from the Charger.  Defendant agreed.  Rose went to the Charger and asked Kastner where they were going.  Kastner responded that they were going to visit defendant's brother.  Rose asked Kastner defendant's name.  Kastner replied "Israel."  Rose confirmed that the rental agreement was in another person's name and did not identify any other individuals as authorized drivers.  Rose returned to the patrol car and asked defendant if his name was Israel.  Defendant confessed to giving a false name.

Rose checked with dispatch and determined that defendant's license had been revoked.  Rose got out of the patrol car, went to the passenger side, and removed defendant from the car in order to place him under arrest.  Rose patted down defendant and retrieved a cigarette pack.  The cigarette pack contained some green leafy vegetation which Rose believed to be marijuana.  Rose instructed defendant to sit back in the patrol car and Rose called for another

-3-

officer.   When the officer arrived, Rose proceeded to search the interior compartment of the Charger.   Rose discovered a package of zigzag rolling papers in the console.   From his experience, Rose knew that such papers are commonly used to roll marijuana cigarettes.   Rose also found Glade air freshener in the passenger area and another brand new air freshener in the glove box.   Rose thought it was unusual for so much air freshener to be in a new rental car.   Rose also knew from experience that individuals who transport drugs use air freshener in order to mask the smell of the drugs.   Rose also discovered what he believed to be marijuana residue on the passenger door rest.

After searching the passenger compartment, Rose read defendant his Miranda rights off of a card that he keeps in his pocket.   Rose asked defendant if he understood the rights and defendant responded affirmatively.   Rose asked defendant if there was anything that would be found in the trunk of the car.  Defendant said no.  When Rose first opened the trunk he smelled a strong air freshener and assumed it was dryer sheets because they are frequently used as a masking agent. Rose did not find any dryer sheets in the trunk but he did discover a large bottle of air freshener.   There were several duffle bags, one which contained numerous large bundles of marijuana.   Rose collected the duffle bag as evidence.   Rose then asked defendant where he got the drugs and where defendant was taking them.   Defendant responded that he got the drugs from illegal immigrants in Arizona.   At that time, the troopers also informed Kastner that she was under arrest. Rose called for a tow truck to take the Charger to the Pratt County Sheriff's Department.   Defendant, Kastner and the children were all transported to the sheriff's department.  Once they arrived, Kastner

-4-

and the children were placed in a room and defendant was placed in a cell.   Rose contacted Task Force Agent Dave Heim to assist in the investigation.[5]   When Heim arrived, defendant was placed in an interview room.   Both Heim and Rose entered the room.   Heim read defendant his rights and asked defendant if he understood those rights and was willing to talk.   Defendant agreed.[6]

After interviewing defendant[7], Heim and Rose decided to release Kastner and the children.   Prior to releasing the children and in order to complete an inventory for the Charger, Rose emptied its contents.   When Rose was moving a yellow mesh bag, he observed that it was very heavy.   Rose opened the bag and discovered two handguns concealed in clothing.   Rose seized the guns as evidence.   Defendant testified that one of the guns was his father's and the other belonged to his brother.   Rose then allowed Kastner to leave in the Charger with the children.

Defendant moves to suppress the search and seizure of evidence from the Charger on the basis that it was the fruit of an illegal detention and/or an unlawful search.   Defendant also asserts that the statements he made to Heim and Rose were involuntary and coerced.

## II.  Analysis

### A.   Initial Encounter

The Fourth Amendment protects "[t]he right of the people to be

---

[5] At the outset of the hearing, defendant moved to sequester the witnesses.   The court denied the request.   Heim is the case agent.

[6] The facts of the interview between Heim and defendant were disputed.   The court will discuss those facts during its analysis.

[7] Heim attempted to interview Kastner but she asserted her Miranda rights.

secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Tenth Circuit has identified three different types of encounters with police officers: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." United States v. Ringold, 335 F.3d 1168, 1171 (10th Cir. 2003). In this case, the government has conceded that Rose did not have reasonable suspicion to stop defendant for a traffic violation. Therefore, the court must determine if the encounter between defendant and Rose was consensual, according to the following objective standard:

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

Id. at 1172 (citing Florida v. Bostick, 501 U.S. 429, 439, 111 S. Ct. 2382, 115 L. Ed.2d 389 (1991)). The Tenth Circuit has cited a nonexhaustive list of factors to consider in order to determine whether the encounter was consensual:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

-6-

Ringold, 335 F.3d at 1172.

It is undisputed that Rose did not stop the Charger or activate his emergency lights. Rose did not park his patrol car in a manner that would have prevented the Charger from leaving the gas station. In other words, defendant voluntarily stopped the Charger at the gas station. After a review of the video tape, the court finds that Rose's voice was in a normal conversational tone and was not demanding or aggressive. While defendant may have declined Rose's initial question ("Can I talk with you?"), the Tenth Circuit has held that a refusal to answer initial questioning does not create a bright line rule that officers must refrain from asking an individual subsequent questions. See United States v. Esparza-Mendoza, 386 F.3d 953, 958 (10th Cir. 2004). Additional questioning after a refusal does not implicate the Fourth Amendment unless the actions taken by an officer rose to a "different dimension than making a second request," i.e. "[f]risking, physically arresting, and searching the suspect." Id. In this case, Rose asked defendant to step to an area away from the empty parking space and then questioned him about the report from dispatch and asked if he had identification. Those additional questions did not rise to a different dimension. Therefore, the additional questions by Rose did not transform the encounter to one that was nonconsensual.

None of the factors set forth by the Tenth Circuit are present here. The encounter took place in a public place, only one trooper was present, the trooper used a conversational tone, the trooper did not brandish his weapon, and defendant's documents were not taken until after defendant was suspected of a crime. The reasonable person

-7-

test presupposes an innocent person. <u>Florida v. Bostick</u>, 501 U.S. 429, 438, 111 S. Ct. 2382, 115 L. Ed.2d 389 (1991). The court finds that a reasonable, innocent person could have concluded that he could leave or terminate the initial, brief encounter. But, of course, defendant knew he was not "innocent." For starters, he knew that he was driving without a license, which everyone knows is illegal.

After discovering that defendant was driving without his license, Rose had reasonable suspicion to detain defendant for a traffic violation. K.S.A. 8-244 states that a driver must have his driver's license in his immediate possession while driving. Driving without a license is a misdemeanor. Rose was then justified in requiring defendant to remain until Rose could determine defendant's true identity. Once Rose determined that defendant was not "Phil Tapia Jr." and that defendant's license was in fact suspended, Rose had probable cause to place defendant under arrest for driving with a suspended license. After placing defendant under arrest, Rose conducted a pat-down search of his person. "[W]hen a person is lawfully arrested, the police may make a contemporaneous, warrantless search of the person for weapons and fruits of the crime." <u>United States v. Chavez</u>, 812 F.2d 1295, 1301 (10th Cir. 1987). The search revealed marijuana in the cigarette package. Rose then proceeded to search the passenger compartment of the Charger without asking permission to search.

Defendant asserts that the search of the Charger was not a lawful search incident to arrest.

> The scope of a search [incident to arrest] must be strictly tied to and justified by the circumstances which rendered its initiation permissible. Because searches

-8-

incident to arrest are meant to discover hidden weapons and to prevent the suspect from destroying evidence, a search incident to arrest may extend only to the area within the suspect's immediate control, as that is the only area from which the suspect could draw a weapon or damage evidence. See id.; United States v. Franco, 981 F.2d 470, 472 (10th Cir. 1992) ("The scope of the warrantless search under this exception is restricted to the person of the arrestee and to any area into which the arrestee could reach." ) Thus, if the police arrest the occupant of a car they may also search the passenger compartment of the vehicle, but they may not search other areas that are outside the suspect's immediate control or "grab" space.

The justification for allowing searches incident to arrest also places a temporal restriction upon the police's conduct. As this court stated in United States v. Lugo, 978 F.2d 631, 635 (10th Cir. 1992), once the immediate rationale for conducting a search incident to arrest has passed, the police may not then engage in a search absent probable cause to do so. See id. ("[W]hen the search of Lugo's truck began, Lugo was no longer at the scene. He was handcuffed and sitting in the back seat of a patrol car proceeding toward Green River. Once Lugo had been taken from the scene, there was obviously no threat that he might reach in his vehicle and grab a weapon or destroy evidence. Thus, the rationale for a search incident to arrest had evaporated.").

United States v. Edwards, 242 F.3d 928, 937 (10th Cir. 2001).

Rose testified that he conducted the search because he believed he had probable cause and that it was a search incident to a lawful arrest. The search, however, was conducted when defendant was handcuffed in the patrol car. At the time, the patrol car was located two cars down from the Charger. The Charger was not within defendant's grab space and there was no risk that defendant would reach into the Charger to destroy evidence or access a weapon. Moreover, defendant had been outside of the Charger and in the patrol car for almost twenty-five minutes at the time Rose made the arrest. The court finds that the search was not a valid search incident to arrest.

The government also argues that the search was based on probable

cause.  "Probable cause to search a vehicle is established if, under
the totality of the circumstances, there is a fair probability that
the car contains contraband or evidence."  <u>United States v. Edwards</u>,
242 F.3d 928, 939 (10th Cir. 2001)(citing <u>United States v. Nielsen</u>, 9
F.3d 1487, 1489-90 (10th Cir. 1993)).  The court finds, however, that
defendant does not have standing to challenge the search of the car.
Defendant was not an authorized user on the rental agreement.
<u>Edwards</u>, 242 F.3d at 936 (citing <u>United States v. Shareef</u>, 100 F.3d
1491, 1499-1500 (10th Cir. 1996) and <u>United States v. Obregon</u>, 748
F.2d 1371, 1374-75 (10th Cir. 1984) (holding that defendant driver had
no reasonable expectation of privacy in a rental car where the rental
agreement demonstrated that the car had been rented by a third party
and there was no evidence that the rental company had permitted
defendant lawfully to drive the car).  Therefore, defendant cannot
challenge the search of the passenger compartment.

   After searching the passenger compartment, Rose opened the trunk
and went through three or four duffle bags before finding the
marijuana.  Those bags contained defendant's and Kastner's personal
items.  Defendant did have an expectation of privacy in the bags in
the trunk.  <u>Edwards</u>, 242 F.3d at 936-37 (unauthorized driver of rental
car had an expectation of privacy in personal bags locked in the
trunk).  Therefore, Rose must have had probable cause to search the
trunk.  At the time of the search of the trunk, Rose found two large
air fresheners in the passenger compartment, rolling papers were in
the console, what he believed to be marijuana residue was on the
passenger door rest, defendant lied to Rose about his identity,
defendant had marijuana on his person, and defendant was an

unauthorized driver in a rental car traveling from Arizona. Rose testified that based on his experience, air fresheners are frequently used by drug traffickers to mask the smell of the drugs. Also, Rose testified that indicators of drug trafficking include individuals who use rental cars and travel from states that are known to be drug states, i.e. Arizona. Based on all the circumstances, the court finds that Rose had probable cause to search the trunk. United States v. Bradford, 423 F.3d 1149, 1160 (10th Cir. 2005).

**B. Statements**

After being transported by Rose to the jail, defendant made incriminating statements during his interview. Defendant admitted that he received his Miranda rights prior to the statements. Both Rose and Heim, whom the court finds to be credible witnesses, testified that defendant was read his Miranda rights prior to the interview and that he agreed to talk with Rose and Heim. A Miranda waiver is valid when it is given voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. at 444. To be voluntary, a statement must be the product of a rational intellect and free will. Townsend v. Sain, 372 U.S. 293, 307 (1963). Therefore, a statement is admissible when it is given freely and voluntarily, after a knowing and intelligent waiver of one's constitutional rights. Jackson v. Denno, 378 U.S. 368, 385-86 (1964). A finding of involuntariness requires a finding of coercive police action. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Not only does the court accept as true that defendant was read his Miranda rights and subsequently waived them, the court also finds the statements defendant made were voluntarily given. Defendant

-11-

asserts that he only made incriminating statements after Heim threatened to arrest Kastner and take the kids away. The court does not find defendant's testimony credible. Defendant repeatedly testified that Heim threatened to "call CPS" to take the kids. The agency that is responsible for the placement of children in Pratt County, Kansas, is the Department of Social and Rehabilitative Services (SRS). Moreover, Heim testified that he did inform defendant what would happen with the children but that he did not make that statement until <u>after</u> defendant gave incriminating statements. But even if the court should credit defendant's testimony that Heim threatened to place the children in state custody, the court is satisfied and finds from the totality of the circumstances, including defendant's somewhat callow demeanor while testifying, that his statements were voluntary. <u>See</u> 18 U.S.C. § 3501(b). Defendant's challenge to the voluntariness of his statements is without merit.[8] <u>See</u> <u>United States v. Chalan</u>, 812 F.2d 1302, 1308 (10th Cir. 1987).

**C. Second Search**

Finally, defendant asserts that the second search of the trunk was impermissible because it was done without a warrant. The government responds that Rose was conducting an inventory search of the items before Rose returned the Charger to Kastner. An inventory

---

[8] In defendant's briefing, defendant also asserts that his statements he made while he was sitting in Rose's patrol car should be suppressed. Rose testified, however, that he read defendant his <u>Miranda</u> rights prior to discovering the drugs in the trunk and prior to any incriminating statements by defendant. Defendant also testified that Rose read him his <u>Miranda</u> rights. During his testimony, defendant only asserted that the statements made in the jail were coerced. Therefore, the court finds that the statements made in the patrol car to Rose were voluntary.

search is "a well-defined exception to the warrant requirement of the Fourth Amendment." <u>United States v. Tueller</u>, 349 F.3d 1239, 1243 (10th Cir. 2003)(citing <u>Colorado v. Bertine</u>, 479 U.S. 367, 371, 107 S. Ct. 738, 93 L. Ed.2d 739 (1987)). "To be justified as an inventory search, . . . the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability." <u>Edwards</u>, 242 F.3d at 938.

The testimony clearly established that the second search was merely an inventory search. Rose testified that he was required to inventory the car before releasing it to the rental car company because it was a rental car and Kastner was not an authorized driver. Rose testified that the inventory was performed so that all of the items in the car that belonged to the rental company could be documented (as opposed to the many items which belonged to defendant and Kastner). Rose also testified that he opened the mesh bag that contained the guns only because it was very heavy. The court finds that the second search of the trunk did not implicate defendant's Fourth Amendment rights.

## III. Conclusion

Defendant's motions to suppress are denied. (Docs. 19, 20).


IT IS SO ORDERED.

Dated this __5th__ day of August 2008, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-13-