**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>   )<br>                    Plaintiff,  )<br>   )<br>v.   )<br>   )<br>ISREAL TAPIA,   )<br>   )<br>                    Defendant.  )<br>_____) | **CRIMINAL ACTION**<br><br>No. 08-10027-MLB |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant's motion for reconsideration. (Doc. 30). By memorandum and order dated August 5, 2008, this court denied defendant's motion to suppress. (Doc. 28). Defendant now seeks reconsideration claiming factual error in two areas: (1) defendant's initial encounter with Trooper Rose and (2) the later inventory search of the trunk of defendant's rental car. The court has carefully reviewed the record, including the transcript of the motion hearing (Doc. 32), and denies defendant's motion for reconsideration.

<u>Initial Encounter</u>

In its earlier order, the court summarized what transpired at the initial encounter between defendant and Trooper Rose:

> Rose exited his patrol car and approached the driver's side window. The Charger contained defendant, a female passenger and two small children. The driver's side window was down about halfway and Rose asked if he could "talk with [defendant] for a minute." Rose heard defendant respond, "I gotta go." Rose observed that defendant was on his cell phone. Defendant stepped out of the Charger. Rose asked defendant if he would "step over here." Defendant replied "Sir."

(Doc. 28 at 2)(footnotes omitted).

Defendant asks the court to review the first thirty seconds of Exhibit 1, the recording of Trooper Rose's initial contact with defendant. Defendant asserts that the recording unequivocally shows that he did not get out of his car until Trooper Rose ordered him to "step over here." Defendant urges the court to reverse the sequence of events so that Trooper Rose's request that "step over here" occurred <u>before</u> defendant's statement "I gotta go."[1] By reversing the sequence, defendant contends that his encounter with Trooper Rose becomes nonconsensual, presumably because it shows that he exited his car involuntarily.

The court did not base its decision regarding the encounter solely on the contents of the tape and declines defendant's request that it do so now. Rather, it based its decision on the totality of the evidence which included the testimony of Trooper Rose, defendant and defendant's girlfriend, Tiffany Kastner. This is the required methodology. <u>INS v. Delgado</u>, 446 U.S. 210, 216-17 (1984). The court is satisfied with the accuracy of its previous findings but since defendant has sought to revisit the evidence, the court believes that some additional observations are in order, particularly because defendant bases part of his reconsideration argument on the court's familiarity with routine police procedure. (Doc. 30, fn 2).

Trooper Rose's initial contact with defendant was based upon a radio report of a speeding car. Trooper Rose did not initiate a stop on the highway using his emergency equipment. Rather, he simply pulled into the gas station in Pratt where defendant already had

---

[1] After listening to the video repeatedly, the court finds that defendant says, "Alright, I gotta go."

-2-

parked and walked over to defendant's car. Trooper Rose did not block defendant's car in any way. While Trooper Rose may have suspected that defendant's car was the one mentioned in the radio report, he could not know for sure because he had not observed the car on the highway. There was no report that the car was involved in any sort of criminal activity such as a robbery or a hit and run accident. Most certainly Trooper Rose did not know that defendant was driving without a license (which had been revoked) and had marijuana and handguns in his car. In short, Trooper Rose's initial encounter at the driver's window of defendant's car was casual and his tone of voice on the tape so reflects.

Predictably, defendant's version of the encounter is different. Defendant testified that he was driving east on U.S. Highway 54 through Kansas and that at a small town west of Pratt, he became "concerned" when a sheriff's vehicle followed him and, when he stopped for gas, the deputy "basically watched everything I did." Defendant believed he was being "profiled in some kind of way" but the sheriff's officer made no contact with him. Defendant resumed his eastbound trip toward Pratt and, after entering the town, saw Trooper Rose make a u-turn to follow his car. According to defendant, his son ". . . had to use the restroom real bad . . ." so he pulled into a QuikTrip. He saw Trooper Rose pull up next to him and ". . . was kind of hoping it wasn't one of those games that was going on in the last town . . . . I didn't want to believe it but I kind of knew he was coming, you know, coming after me." These statements gave the court a negative impression of defendant's personality and demeanor, which continued throughout his testimony.

Defendant went on to testify that he was not on a cell phone and instead ". . . kind of waited a little bit to see what this guy was gonna do . . . ." According to defendant, when Trooper Rose came to the window of his car, and asked to speak with him for a minute, defendant was "kind of aggravated" and told Trooper Rose ". . . no, I gotta go . . .", an interesting remark in view of the supposed urgency of his son's situation. Defendant testified that "I seen his hand was on his gun and [he] opens my door" after which Trooper Rose asked him to "step over here." Defendant then made a statement which went a long way towards ending the veracity of his description of the encounter.  Defendant testified "well, I was kinda of scared, you know, sir, officer you know he pulled out the gun." Defendant's counsel, who undoubtedly knew that this statement was not true, immediately interrupted and asked "he never pulled out the gun, did he?" Defendant stammered this response: "Well, he's got it on his hand. I mean, it, I don't know, I don't, he's got it right there on his hand, opens my door, so I kind of panicked, just went along with his -- I went along with it." Counsel then turned to the subject of defendant's revoked driver's license.

In his motion, while defendant admits that there is a dispute as to who opened the door, he asserts that there is no dispute that defendant stepped out of his car at the direction of Trooper Rose. "<u>There is no request for Mr. Tapia to exit his vehicle.  There is no reason for Mr. Tapia to exit his vehicle unless requested by Trooper Rose.</u>  Furthermore, no one exits a vehicle unless directed by police authority after police initiate contact.[2]" In footnote 2, defendant candidly admits that there is nothing in the record to support the

-4-

statement that no one gets out of the car unless directed by police authority but that "despite the lack of record, the Court should be familiar with routine police procedure.  It is a matter of officer safety."

The court disagrees that there is no dispute that defendant got out of his car following the order of Trooper Rose.  The audio portion of the video reflects that Rose asked defendant to "step over here" approximately six seconds after defendant says he has to "go."  The delay would have allowed defendant to get out of his car before Trooper Rose asked him to "step over here."  If defendant was still in the car, it seems reasonable that Trooper rose would have asked him to get out of the car.  The request to "step over here" strongly suggests that defendant was already out of the car.  The court believes Trooper Rose's version of the events.

Since defendant has invoked this court's familiarity with police procedure, the court will state that he has heard officers testify that when they stop a vehicle, they prefer that the driver stay in the vehicle, not only for officer safety but for the safety of the driver. But the court has also heard testimony on numerous occasions where the driver voluntarily got out of the vehicle immediately upon being stopped and the court has observed several videos taken from troopers' cameras which confirm that occurrence.  Not infrequently, this happens when there is something in the vehicle which the driver hopes the officer will not see, or smell or otherwise discover.  Like here.

In this case, the only way to accept defendant's version of the events is for the court to believe defendant and his girlfriend and disbelieve Trooper Rose.  Apart from the incredible testimony and

negative demeanor of defendant and his girlfriend about which the court has commented herein and in the previous memorandum and order, why would Trooper Rose lie about the encounter?  This was not even a routine traffic stop for speeding.  Defendant's car was parked at a QuikTrip.  There was no safety hazard from passing vehicles.  What would be Trooper Rose's motivation to say that defendant was speaking on a cell phone if defendant was not?  If defendant was speaking to Trooper Rose instead of on the cell phone when he admittedly said "alright I gotta go," had he forgotten his little boy in the back seat who was desperate to use the bathroom, the whole reason why defendant says he pulled into the QuikTrip in the first place?  And again, since defendant has raised the subject of this court's familiarity with police procedure, the court cannot recall a situation in which a driver, in response to a casual request from an officer to speak, responds "no, I gotta go" to the officer before even knowing what the officer wants.

But for purposes of discussion, the court will assume that defendant's version of the events is accurate.  He was sitting in his car when Trooper Rose approached with his hand on his weapon and asked to speak with defendant.  Defendant responded "no, I gotta go."  In United States v. Lopez, 443 F.3d 1280 (10th Cir. 2006), a case which defendant claims is "directly aligned" with this one, the court makes the following statement:

> The Supreme Court has made clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L.Ed.2d 389 (1991). To constitute a seizure, an encounter between an officer and a citizen must involve the use of physical force or show of authority on the part of the officer such that a

>  reasonable person would not feel free to decline the
>  officer's requests or terminate the encounter. <u>Id.</u> at 439,
>  111 S. Ct. 2382.

<u>Id.</u> at 1283.  If defendant's version is to be credited, even in the face of a show of authority, defendant told Trooper Rose that he would not talk with him and instead had to "go."  In other words, defendant felt free to decline Trooper Rose's request and free to terminate the encounter.  Accordingly, even under defendant's version, there was no seizure.  That occurred shortly thereafter, after defendant admitted to Trooper Rose that his driver's license had been revoked.  Defendant does not challenge the encounter after that admission.  It is illegal to operate a motor vehicle in Kansas without a license (not to mention on a revoked license) and Trooper Rose thus had reasonable suspicion to believe that defendant had committed a misdemeanor.  Trooper Rose had the authority to detain defendant for further questioning and defendant does not seriously contend otherwise.

### Inventory Search

In its earlier memorandum and order, the court found that the two handguns in the trunk of the rental car were discovered during an inventory search.  The weapons were in a mesh bag. Defendant asserts that the court's finding was factually incorrect because Trooper Rose's search of the mesh bag ". . . was to discovery [sic] the source of weight and <u>not to do an inventory search</u>.  Trooper Rose was conducting a warrantless search for a heavy object.  He was investigating."  Defendant also contends that the search was "contrary to the standardized practices and procedures of the Kansas Highway Patrol."

Defendant does not identify the practices and procedures of the

-7-

highway patrol which supposedly were not followed. The court has reviewed the testimony of Troopers Rose and Heim, concentrating especially on their cross examination. The only possible testimony occurred during the recross examination of Trooper Heim:

> BY MR. KAUFMANN:
>
> Question: So there is no inventory until everything -- there is no inventory search until everything is taken out of the vehicle; is that correct?
>
> Answer: No.
>
> Question: So where's the inventory search where everything in the vehicle is listed?
>
> Answer: It's -- I think it's maybe an interpretation of the policy or the rule of the inventory. And I've seen troopers do it two different ways where when an inventory is compiled, it's the list of this is what's in the car, one suitcase containing men's clothes, miscellaneous items; or in this manner in which Trooper Rose was inventorying only what was in the car after he released it or when -- at the time that he released it.
>
> MR. KAUFMANN: Thank you. Nothing else.

(Tr. at 85). No violation is apparent from this testimony.

In earlier testimony, defendant's counsel focused on the fact that the inventory of the Charger did not include the "hundreds" of

-8-

items which were removed from the car but rather only the owner's manual, a bag of trash and the spare tire (Exhibit 5). Trooper Rose explained that because the car was a rental and because neither defendant nor Kastner could drive it (defendant was under arrest and Kastner was not an authorized operator under the rental agreement), the rental car company was contacted and that the company "wanted us to impound it."[2] The inventory was intended to reflect what belonged in the car, not what belonged to the occupants, i.e., defendant, Kastner and the two children. While it does not make sense that the inventory would include a bag of trash, there is nothing in the testimony and evidence to indicate that highway patrol policy was violated.

Turning to defendant's other argument, he seems to be contending that because the "hundreds" of items were not included on the inventory sheet (Exhibit 5), the search of the mesh bag in which the weapons were found was not a legitimate inventory search. At the time the court entered its previous order, it did not have the transcript of the hearing to review. After reviewing that transcript, the court agrees that the inventory sheet would not be reflective of the inventory of the vehicle. If Rose was documenting items that were the property of the rental car company, there would be no need to look in the bags of clothes in the trunk. At the time the court decided the initial motion, the government argued that the search was a proper inventory search and the court agreed. Now, however, the government asserts that the search was a lawful probable cause search.

---

[2] For reasons which are not explained, Kastner eventually was allowed to drive the car.

Heim's police report indicates that the car was towed to the sheriff's office so that the officers could conduct both an inventory <u>and</u> probable cause search. (Exh. 4 at 3). The report is consistent with Heim's testimony during cross examination:

BY MR. KAUFMANN:

Question: Because I think on your direct you told me that several times you stopped and compared things with what you saw in the car. So are you going in and out of that car?

Answer: I was probably in the car maybe once or twice. Trooper Rose was still taking stuff out of it and that kind of thing.

Question: When you went into the car, did you have a warrant?

Answer: No.

Question: Okay. You seem to indicate that -- excuse me. When you see Mr. Rose in the car, is he still searching through the car?

Answer: Well, yeah, that's what he's doing.

Question: Do you know if he has a warrant at that time?

Answer: I know he doesn't have one.

>     Question: So there's -- have you discussed with him at this
>     point what's gone on?
>
>     Answer: Yes.
>
>     Question: So you know that he did a probable cause search
>     at the scene?
>
>     Answer: Well, it's -- I believed it was continuing.
>
>     Question: At one point do you mention that he's doing an
>     inventory search? Paragraph 8 of your report.
>
>     Answer: I see that. It says vehicle was towed to the
>     Sheriff's Office where an inventory and probable cause
>     search could be conducted.
>
>     Question: So when he's in there with you, you're doing an
>     inventory with him?
>
>     Answer: Inventory and probable cause, yes.

(Tr. at 80-81).

Prior to the inventory and probable cause search of the car at the station, Rose had lawfully seized more than 29 pounds of marijuana <u>from the trunk</u> of the rental car. The government argues that this seizure provides probable cause for the officers to conduct a second search of the trunk. The court agrees. "If probable cause justifies

-11-

the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed.2d 572 (1982).  Rose initially impounded the vehicle pursuant to the request of its owner, the car rental company, and had probable cause to believe that the trunk contained contraband (which, in fact, it did).  Therefore, the second search of the trunk was a lawful search.

## Conclusion

Defendant's motion for reconsideration is denied.  (Doc. 30).

IT IS SO ORDERED.

Dated this   15th    day of October 2008, at Wichita, Kansas.


s/ Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE